UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| BROOK BERNINI, MATTHEW BYRNES, SIMON CECIL, ANDREW COHEN, DAVID DREW JR, KELLAN DUBBELS, KRISTOFER DUBBELS, ALANA MICHELLE EXUM, BOBBY REESE HAGY JR, ADAM HAYDEN, ADRYN HAYES, KEVIN HUNDT, RACHEL JACKSON, TIANA JOHNSON, GARTH KAHL, JARED LANCTOT, MICHAEL LARSON, VAIN MAINSTREAM, DAVID MORSE, CRAIG NEEF, MARY OGLE, TIM PHILLIPS, RAPHI RECHITSKY, LAMBERT ROCHFORT, NICK SEGNER, RYAN SOLEM, ZACH SWIFT, ANDREW TEMPERANTE, MICHAEL WARD, II, RACHEL WESTLUND, NELSON WHITMORE, and BRUCE WILKINSON | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>CIVIL ACTION NO. 09-2312 PAM/JJG |
| On behalf of themselves and all others similarly situated, | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| CITY OF ST. PAUL, STEVEN FRAZER, BILL SNYDER, JOE NEUBERGER, AXEL HENRY, PATRICIA ENGLUND, and MATTHEW CLARK, In their individual capacity, | ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) ) | |

## I.    INTRODUCTION

The parties to this case present polar opposite versions of the same event:  a mass arrest

on Shepard Road during the Republican National Convention.  The defendants contend that they

1

were the victims of a full-scale attack by a 400-strong mob in the midst of a state of emergency in downtown St. Paul.  The plaintiffs, all arrested in the mass arrest, have brought forth ample evidence to show that the claimed attack never happened, that the police were the aggressors, and that they and many other innocent civilians were the victims of an unlawful police sweep of Shepard Rd., resulting in the mass arrest.  Indeed, the police commander responsible for executing the mass arrest has admitted that he knew he was ordering the arrest of many innocent civilians:

> Q.  Okay.  And did you -- and before that [arrest] order was given, you knew that you had approximately 200 people in the area within the encirclement who you did not have probable cause on?
>
> A.  Correct.

On a motion for summary judgment, such factual disputes should not be resolved by the court. They are the province of the jury, and defendants' motion should thus be denied.

**II.   FACTS**

**a.  The Defendants**

This case arises out of a mass arrest in the City of St. Paul on September 1, 2008, the first day of the Republican National Convention ("RNC").

The St. Paul Police Department had a Civil Disturbance Management Plan to guide its law enforcement activities during the RNC. (Frazer Aff., Ex. M.)  Attached as Appendix D to the Plan was a Mass Arrest Warning.  Absent exigent circumstances, the Warning was to be issued by police officers prior to a mass arrest. (2nd Tindal Aff., Ex. F, Neuberger Depo., pp. 145-46; 6th Shulman Aff., Ex. 58.)  The Warning required officers to provide a dispersal route to civilians and was to be repeated at specific intervals to allow civilians adequate time to disperse. (Frazer Aff., Ex. M.)

2

In training leading up to the RNC, law enforcement officers, including the defendants here, all had instruction on constitutional principles relevant to making arrests, the use of force, and the First Amendment. (6th Shulman Aff., Ex. 55)  This training set out Fourth Amendment case law on false arrests and excessive force. (Id.)  The training also discussed the First and Fourth Amendments in the context of civil disorder. (6th Shulman Aff., Ex. 57.)  Officers were instructed to use a formal arrest warning prior to executing a mass arrest. (6th Shulman Aff., Ex. 58.)  Finally, defendants also studied how other cities handled civil disturbances where mass arrests had been made. (6th Shulman Aff., Ex. 56.)

Defendant Joseph Neuberger, a member of the St. Paul Police Department, was a Senior Commander in charge of mobile field force command post operations for the RNC. (Neuberger Depo., pp. 5, 10.)  Sr. Cmdr. Neuberger understood that he had to have probable cause to arrest a person and that he was only allowed to use an objectively reasonable amount of force in effecting an arrest. (Id. at 12.)  Sr. Cmdr. Neuberger understood, and it was taught in officer training, that if a crowd was moving in the direction desired by officers, officers should not use additional force beyond their own presence. (Id. at 150.)  Sr. Cmdr. Neuberger believed that it was inevitable that the police would be sued for their actions during the RNC, and officers were informed of this in their training. (Neuberger Depo., pp. 152-53; 6th Shulman Aff., Ex. 55.)

On September 1, 2008, Sr. Cmdr. Neuberger had the assignment of east area commander for the mobile field force ("MFF") operations. (Neuberger Depo., pp. 12-13.)  A MFF is a unit of law enforcement officers consisting of 75-100 officers. (Neuberger Depo., p. 13.)  Sr. Cmdr. Neuberger oversaw five MFF's in the east area. (Id.)  On September 1, Sr. Cmdr. Neuberger was working out of the MFF Command Post. (Id. at 19.)  At the Command Post, he had live television feeds of the downtown area, radio communication, and telephone communication with

3

other law enforcement officers. (Id. at 21-22, 24.)  The actions of MFF's, including the use of

riot control agents, had to be approved by Sr. Cmdr. Neuberger, absent exigent circumstances.

(Id. at 31-33.)

Sr. Cmdr. Neuberger had only limited television coverage of the events on Shepard Rd.

and relied on radio communications for his decision-making. (Neuberger Depo., pp. 25-26.)  For

the events on Shepard Rd., Sr. Cmdr. Neuberger did not communicate with the F.B.I., Secret

Service, or Department of Homeland Security. (Id. at 23-24.)

Defendant Steven Frazer, a member of the St. Paul Police Department, had a significant

role in the training of officers leading up to the RNC. (2nd Tindal Aff., Ex. E, Frazer Depo., p. 7.)

Cmdr. Frazer understood that he had to have probable cause to arrest a person and that he could

only use force consistent with *Graham vs. Connor*. (Id. at 10-11.)  Cmdr. Frazer knew that

probable cause was required for mass arrests too. (Id. at 230.)  Cmdr. Frazer understood that

officers were not to use gas against a crowd moving in the direction commanded by officers. (Id.

at 205-08.)  In his training for the RNC, Cmdr. Frazer was informed that he would be sued for

his actions during the RNC. (Id. at 161.)  On September 1, 2008, Cmdr. Frazer was acting as

Commander of a MFF. (Id. at 11-12.)

Defendant Axel Henry is a Sergeant in the St. Paul Police Department.  Sergeant Henry

understood that he was only allowed to use objectively reasonable levels of force against

suspects. (2nd Tindal Aff., Ex. G, Henry Depo., p. 11.)  Sergeant Henry believed, however, that it

was permissible to use "inert blast balls or things that made noise or produced smoke" to herd a

crowd already moving in the direction desired by officers. (Id. at 14.)  On September 1, 2008,

Sergeant Henry was acting as lead sergeant for Neighborhood Response Team ("NRT") 36 in

downtown St. Paul, leading a group of approximately 21 officers. (Id. at 14-16.)

4

On September 1, 2008, defendant Patricia Englund, a member of the St. Paul Police Department, was assigned to NRT 36. (2nd Tindal Aff., Ex. H, Englund Depo., p. 11.)

On September 1, 2008, defendant Matthew Clark was in charge of the Minneapolis Chemical Agent Response Teams ("CART") at the RNC. (3rd Tindal Aff., Ex. J, Clark Depo., pp. 17-18.) Though Lt. Clark was an employee of the Minneapolis Police Department, on September 1, he was also under the direction of Sr. Cmdr. Neuberger. (Id. at 20-21.) Lt. Clark understood that he could not use more force than necessary to accomplish his law enforcement objectives. (Id. at 17.) Lt. Clark understood that he could not use gas or other non-lethal weapons against compliant suspects. (Id.) Lt. Clark understood that he had to have probable cause to arrest a person. (Id. at 15-16.)

**b.  The Incident Begins**

Late in the afternoon of September 1, 2008, a group of civilians walked eastbound on the sidewalk on the south side of Shepard Rd. in downtown St. Paul. (Shulman Aff., Ex. 5, 00:00-00:56.) The civilians were not interfering with traffic or acting in an unruly manner. (Id.) Sgt. Henry with NRT 36 drove by the civilians and did not believe that he had probable cause to arrest them. (Henry Depo., p. 60.) Sgt. Henry did not perceive all of the civilians along Shepard Rd. to be part of the same group. (Id. at 70.) NRT 36 drove to the intersections of Jackson St. and Shepard Rd. and Sibley St. and Shepard Rd. to block access into downtown from Shepard Rd. (Id. at 73.)

When the group of civilians reached Jackson St. and Shepard Road, they waited on the south side of Shepard Rd. (First Tindal Aff., Ex. B, 00:30-01:25; Shulman Aff., Ex. 4, 00:00-00:45.) NRT 36 stood across the entrance to Jackson St. on the north side of Shepard Rd. (First Tindal Aff., Ex. B, 00:30-01:25; Shulman Aff., Ex. 4, 00:00-00:45; Henry Depo., p. 73.)

5

Sr. Cmdr. Neuberger had sent NRT 36 to block this entry point into downtown. (Neuberger Depo., p. 47.)  Sr. Cmdr. Neuberger instructed Sgt. Henry not to allow civilians to enter back into downtown. (Neuberger Depo., pp. 35-38; Henry Depo., pp. 63-64.)  Sr. Cmdr. Neuberger gave this directive "to clear the downtown of these anarchist groups and -- and violent protesters, and reestablish control, reestablish law enforcement presence in and around downtown." (Neuberger Depo., pp. 38-39, 43-44.)  Although there were thousands of protesters in St. Paul that day, information received by law enforcement indicated that only a "small minority" was responsible for the alleged criminal acts. (3rd Tindal Aff., Ex. K.)

Sr. Cmdr. Neuberger had decided to clear downtown of all groups on foot, whether law-abiding or not, because he had declared the entire downtown to be a crime scene:

Q.  What about individuals who were on foot about whom you did not have any information that they were violent?

A.  It would depend on the location.  But in general, I would -- if it was a large group, my guess would be that they would have been, you know, moved out of downtown also.

Q.  Well, you said your guess.  You know for a fact that at least from Shepard Road, no groups were allowed to walk back into downtown after about 4 p.m. on the 1st.  Right?

A.  Correct.

                               *       *       *

Q.  Are you saying that there were no law-abiding citizens on Shepard Road on the afternoon of September 1st who sought to get back into downtown by either Jackson or Shepard?

A.  I'm not saying that.

Q.  Or Jackson or Sibley?  Sorry.

A.  No.  I'm not saying that, that there -- there were no law-abiding -- or that -- if I understand your question, I'm not saying everybody on Shepard Road was a criminal.

*     *     *

Q.  Well, would you agree that you kept out of downtown St. Paul people who were law-abiding on the afternoon of September 1st?

A.  Potentially, yes.  There was a period of time that we established a police cordon, like we would do a crime scene, and till we could figure out who was what.

Q.  And were you troubled at all about keeping out people who were law-abiding?

A.  Well, at that point, we didn't know who was and who wasn't.

Q.  So it was keep people out first, decide who was law-abiding second?

A.  Establish the law enforcement presence and control, yeah.  Reestablish a -- a presence, you know, to -- to make sure that the folks that were there were, in fact, law-abiding. Because it was -- leading up to it, again, as we said, it was out of -- I said it was out of control.

Q.  Was all of downtown a crime scene on the afternoon of September 1st, 2008?

A.  In a broad sense, yes.

(Neuberger Depo., pp. 44-47.)

Later, however, Sr. Cmdr. Neuberger backed off this testimony and revealed that the decision on whom to allow to pass and whom to block was largely arbitrary:

Q.  Once -- well, once at -- once NRT 36 was at Jackson and Sibley, could individuals have walked --

A.  Yes.

Q.  -- past them up Sibley and Jackson?

A.  Yes.  Yes.

Q.  Okay.  Did you make that clear to NRT 36?

A.  As far as like a specific command, no.

Q.  Okay.  What -- on what do you base your statement that individuals could have walked past NRT 36 on Jackson or Sibley towards downtown?

A.  That -- well, we had been operating for most of the afternoon under that premise, that if there was one or two or three or four and -- and they didn't outwardly appear to be causing any problems, they had free reign of downtown.

Q.  Okay.

A.  Had been going on all afternoon.

Q.  What about a family of five, two parents, three small children, would they have been allowed to enter downtown from Shepard Road on Jackson or Sibley?

A.  I would have hoped so, yes.

Q.  Okay.  What about a group of ten, so we're talking maybe two parents, a couple of aunts and uncles, and, say, six kids?

A.  Again, it's going to be situationally dependent, who are they with and what are they doing.  If it's just this family unit, is that what you're saying?

Q.  Yes.

A.  Then I would have hoped that they would have.

Q.  What about a 21-year-old wearing dark clothes and a hoodie?

A.  As an individual?

Q.  Yeah.

A.  Don't know.  Again, it would have been situationally dependent by the NRT team.

Q.  Okay.

A.  I would like to think they would have.  But again, given what had been going on all day and sort of the -- the MO of the anarchists and the protesters, if they were -- if they were -- face was covered, hoodie, mask, things like that, probably not.

Q.  Okay.  I mean, did you provide some training or criteria to NRT 36 on who would be allowed back into downtown St. Paul and who wouldn't?

A.  Not specific.  It was common sense.

(Id. at 50-52.)  According to Cmdr. Frazer, however, no persons "would have been allowed to go through [Jackson St.], other than law enforcement." (Frazer Depo., p. 83.)

In total, there were approximately 30-40 civilians on the sidewalk on the south side of Shepard Rd across from the NRT 36 officers blocking Jackson St. (Shulman Aff., Ex. 4, 00:00-00:45.)  The officers did not give any orders or directions to the civilians. (First Tindal Aff., Ex. B, 00:30-01:25; Shulman Aff., Ex. 5, 01:25-02:15.)  No one was throwing anything at the officers. (First Tindal Aff., Ex. B, 00:30-01:25; Shulman Aff., Ex. 3; Ex. 4, 00:00-00:45; Ex. 5, 01:25-02:15.)

A small group of approximately ten to fifteen civilians then attempted to cross Shepard Rd. toward Jackson St. (First Tindal Aff., Ex. B, 01:25-01:30; Shulman Aff., Ex. 3; Ex. 5, 01:25-02:15.)  The civilians walked behind two signs because one of the officers had been aiming a rifle at the crowd. (First Tindal Aff., Ex. B, 01:25-01:30.)  None of the plaintiffs was part of the small group that attempted to cross the street behind the signs. (6th Tindal Aff., Ex. QQ; 3rd Shulman Aff., Exs. 24-29; 4th Shulman Aff., Exs. 30-30; 5th Shulman Aff., Exs. 40-49; 6th Shulman Aff., Exs. 50-54.)

When the small group behind the sign reached the median of Shepard Rd., Sgt. Henry and other officers in NRT 36 began to throw stinger blast balls at them.  (First Tindal Aff., Ex. B, 01:30-01:35; Shulman Aff., Ex. 3; Ex. 4, 00:45-01:15; Ex. 5, 02:19-02:50; Henry Depo., pp. 37-38, 109-15.)  Stinger blast balls have rubber pellets inside them and are intended to sting or hurt suspects when the devices explode. (Henry Depo., pp. 37-38.)  Sgt. Henry's use of the first stinger blast ball served as an authorization for the other officers to use weapons against the civilians. (Id. at 120.)

9

In response to the officers' use of weapons, the civilians who had attempted to cross Shepard Rd. retreated to the sidewalk. (First Tindal Aff., Ex. B, 01:30-01:45; Shulman Aff., Ex. 3, Ex. 4, 00:45-01:15.)  Shepard Rd. remained largely clear of persons on foot, as people on the sidewalk moved west, away from the officers, in response to the officers' use of weapons. (First Tindal Aff., Ex. B, 01:30-02:15; Shulman Aff., Ex. 3, Ex. 4, 00:45-02:40; Ex. 5, 02:30-02:50.)

Lt. Clark and CART Team 6 arrived at the intersection of Jackson St. and Shepard Rd. as NRT 36 was starting to use force against the civilians. (Clark Depo., pp. 28-33, 95.)  Lt. Clark believed the civilians to be "protesters." (Id. at 41-42.)

As civilians moved west on the sidewalk, NRT 36 and CART Team 6 continued to use smoke, blast balls, and other non-lethal weapons against the crowd. (First Tindal Aff., Ex. B, 01:45-3:30; Shulman Aff., Ex. 3, Ex. 4, 01:49-02:40; Ex. 5, 02:30-03:30; Clark Depo., p. 37.)  At no time did anyone throw anything at the officers. (First Tindal Aff., Ex. B, 01:45-3:30; Shulman Aff., Ex. 4, 01:49-02:26; Ex. 5, 02:30-03:30.)  Lt. Clark did not hear officers give any dispersal orders. (Clark Depo., p. 75.)

None of the plaintiffs observed law enforcement officers on Shepard Rd. give dispersal orders. (4th Tindal Aff., Exs. V-CC; 5th Tindal Aff., Exs. DD-II; 6th Tindal Aff., Exs. JJ-OO, RR, SS; 2nd Shulman Aff., Exs. 10-19; 3rd Shulman Aff., Exs. 20-23; Clark Depo., p. 64.)  The plaintiffs also did not do anything to disobey or threaten any officers. (4th Tindal Aff., Exs. V-CC; 5th Tindal Aff., Exs. DD-II; 6th Tindal Aff., Exs. JJ-OO, RR, SS; 2nd Shulman Aff., Exs. 10-19; 3rd Shulman Aff., Exs. 20-23.)  No plaintiff threw anything or saw anyone else throw anything at law enforcement officers on Shepard Rd. (6th Tindal Aff., Ex. QQ; 3rd Shulman Aff., Exs. 24-29; 4th Shulman Aff., Exs. 30-30; 5th Shulman Aff., Exs. 40-49; 6th Shulman Aff., Exs. 50-54.)

As civilians moved west on Shepard Rd., NRT 36 and CART Team 6 also began walking westbound. (First Tindal Aff., Ex. B, 3:30-11:00; Shulman Aff., Exs. 1, 3, Ex. 4, 03:00-05:56; Ex. 5, 04:10-04:28; Englund Depo., p. 56.)  The officers pursued the crowd at a brisk walking pace. (Shulman Aff, Ex. 1.)  This had the effect of pushing the crowd to the west, sometimes at a running pace. (First Tindal Aff., Ex. B, 3:30-11:00; Shulman Aff., Ex. 1, Ex. 4, 3:00-05:56; Ex. 5, 04:10-04:28; Clark Depo., pp. 92-93.)  Almost all of the crowd was on the sidewalk. (First Tindal Aff., Ex. B, 3:30-11:00; Shulman Aff., Ex. 1, Ex. 4, 04:00-05:56.)  The officers were herding so many civilians down Shepard Rd. that the sidewalk was crowded with people. (Shulman Aff., Ex. 4, 04:15-05:56; Henry Depo., p. 132.)

For the few civilians in the roadway, Sgt. Henry was not doing anything to direct them back on to the sidewalk. (Henry Depo., p. 132.)  The officers blocked Shepard Rd. with their presence. (First Tindal Aff., Ex. B, 3:30-11:00; Shulman Aff., Ex. 3, Ex. 4, 03:00-05:56.)  Officers at both ends of Shepard Rd., however, had blocked traffic in both directions because of this incident. (Frazer Depo., pp. 55-56.)  None of the civilians turned around to come back toward the officers. (Clark Depo., pp. 97-98.)

Though the civilians were compliant in continuing to move westbound along Shepard Rd., NRT 36 continued to use non-lethal weapons against them in the form of gas, smoke, pepper spray, and blast balls. (First Tindal Aff., Ex. B, 5:17, 6:17, 9:32; Shulman Aff., Ex. 3, Ex. 4, 04:35-05:35; Englund Depo., p. 58.)  Officers even threw smoke or gas canisters directly into the westbound crowd on the sidewalk. (Shulman Aff., Exs. 1, 3, Ex. 4, 04:35-05:35.)  There was no provocation or resistance from the crowd to prompt this use of force. (Id.)  This forced civilians to walk or run through the gas to continue moving westbound, the direction the officers wanted them to move. (Id.)  One officer repeatedly used pepper spray against civilians who were

11

walking westbound on the sidewalk. (Shulman Aff., Ex. 4, 04:45-05:05.)  Officers arriving to assist with the westbound herding were instructed to "mask up" because of the officers' use of chemical agents. (Neuberger Depo., pp. 73-74, 88.)

As the Officers continued to walk westbound they filled all of Shepard Rd. with their presence, effectively temporarily blocking traffic. (First Tindal Aff., Ex. B, 3:30-11:00; Shulman Aff., Ex. 6, 01:20-02:00.)  The officers' presence and use of gas in the street caused eastbound vehicles to perform u-turns across the median. (Shulman Aff., Ex. 6, 01:20-02:00.)

The officers were herding hundreds of civilians west on the sidewalk. (First Tindal Aff., Ex. B, 3:30-11:00; Shulman Aff., Exs. 1, 3, Ex. 4, 04:15-04:45.)  Sgt. Henry did not believe that all of the civilians being herded were rioters. (Henry Depo., pp. 136-37.)  After herding civilians a significant distance down Shepard Rd., the officers stopped. (First Tindal Aff., Ex. B, 11:00; Henry Depo., pp. 141-43.)

Cmdr. Frazer then arrived with a MFF of approximately 76 officers at Shepard Rd. and Jackson St. in response to a distress call from NRT 36. (Frazer Depo., pp. 17, 19; Henry Depo., pp. 141-43.)  As Cmdr. Frazer arrived, officers were just concluding using riot control agents against the civilians; none were used after he assumed incident command. (Frazer Depo., pp. 110-11, 114-15.)  Cmdr. Frazer believed that the civilians "had some cause or something that they were protesting." (Id. at 46.)  According to Cmdr. Frazer, the civilians "had a lot of signs. They had a lot of banners and things like that that had messages on them." (Id.)

When Cmdr. Frazer arrived on the scene, he was designated Incident Commander. (Neuberger Depo., pp. 100-01.)  This designation gave Cmdr. Frazer authority to make command decisions in the field for all law enforcement units at the scene. (Neuberger Depo., pp. 100-01;

12

Frazer Depo., p. 37.)  Because of arriving reinforcements, when Cmdr. Frazer arrived on the scene, there were approximately 150-175 officers present. (Frazer Depo., p. 39.)

Cmdr. Frazer orchestrated a plan to "corral" the civilians into park land on the south side of Shepard Rd., near Ontario St. (Frazer Depo., pp. 90-93.)  Cmdr. Frazer executed this plan by forming a police line across Shepard Rd. to continue the sweep of civilians westbound and by forming a police line to the west to contain the civilians being pushed westbound. (Id.)

Lt. Clark was responsible for the police line to the west. (Frazer Depo., pp. 90-93, 97; Clark Depo., p. 57.)  Lt. Clark created a "blocking force" across Shepard Rd. near Ontario St. to prevent people from moving westbound. (Clark Depo., p. 62; 3rd Tindal Aff., Ex. M.)  Lt. Clark did not give a dispersal order to the civilians in the park land to the east of his "blocking line." (Clark Depo., p. 64.)  To the contrary, he took steps to ensure that civilians were kept back from his "blocking line." (Id. at 69-70.)

Once Cmdr. Frazer had the police lines formed, he intended to have arrested the civilians being corralled. (Frazer Depo., p. 96.)  Cmdr. Frazer knew that there were civilians between the two police lines whom he did not believe were part of any law-breaking group. (Id. at 97-98.) Cmdr. Frazer did not give the dispersal warning from the Civil Disturbance Management Plan because officers were not seeking dispersal; they were seeking to make arrests. (Id. at 223.)

More law enforcement officers arrived from the east on Shepard Rd., and the officers herded the civilians on the sidewalk the rest of the way into the park on the south side of Shepard Rd. (Frazer Aff., Ex. D, 09:07-16:00; Shulman Aff., Ex. 6, 07:25-09:34; First Tindal Aff., Ex. B, 16:07-16:43.)  During this herding, the crowd was orderly and mostly on the sidewalk. (Frazer Aff., Ex. D, 09:07-16:00; Frazer Depo., pp. 101-02.)  Cmdr. Frazer was not concerned about small groups of people being in the street. (Frazer Depo., pp. 104-05.)

Once the officers had completed herding the civilians into the park, they formed an encirclement around the park, with the river acting as a barrier on the south side. (Frazer Aff., Ex. D, 16:00; Shulman Aff., Ex. 7; Frazer Depo., p. 108.)  The encirclement was intended to prevent the civilians within it from leaving. (Neuberger Depo., p. 96.)  The officers had surrounded 400 or more persons in the park. (Shulman Aff., Ex. 2; Frazer Aff., Ex. D, 16:00-23:45; Neuberger Depo., p. 110; Clark Depo., p. 74.)  Once the encirclement was in place and before the arrest order was given, officers did not allow civilians to leave. (Frazer Depo., p. 128.)

**c. The Mass Arrest**

Sr. Cmdr. Neuberger believed it was lawful for officers to detain innocent civilians as part of their process of identifying alleged criminals. (Neuberger Depo., pp. 81-82, 87-88.)  Sr. Cmdr. Neuberger also believed that he could arrest innocent persons as part of officer attempts to identify alleged criminals:

> Q.  So under certain circumstances, you believed it lawful to arrest a group of people containing innocent people for the purpose of identifying lawbreakers?
>
> A.  Yes.
>
>                       \*      \*      \*
>
> Q… Was it lawful -- did you believe it to be lawful to place under arrest a group of people for the purpose of identifying lawbreakers when you lacked probable cause on some of the people in the group?
>
> A.  Yes, sir.
>
> Q.  And was that a belief that you -- that -- well, that's a belief you held on September 1st, 2008?
>
> A.  Yes, sir.

(Id. at 85-86.)

14

For the next approximately nine minutes, the civilians within the encirclement acted peacefully. (Frazer Aff., Ex. D, 16:00-24:53; Shulman Aff., Ex. 2; Frazer Depo., p. 131.)  During this period, law enforcement officers did not give any dispersal orders. (Frazer Aff., Ex. D, 16:00-24:53; Shulman Aff., Ex. 2.)  To the contrary, Lt. Clark had an officer command the civilians by loudspeaker, "Ladies and Gentlemen, please move back from the line of officers." (Frazer Aff., Ex. D, 23:00; Clark Depo., pp. 77-78.)  Shortly after that, an officer twice commanded the crowd by loudspeaker to "sit down and place your hands on top of your head." (Frazer Aff., Ex. D, 24:25-24:40.)  In his affidavit, Cmdr. Frazer refers to this as the "arrest warning given at 24:39."  Approximately eight minutes after the encirclement was formed, officers moved in closer to the civilians to tighten the encirclement. (Frazer Aff., Ex. D, 23:45-24:40.)

Sr. Cmdr. Neuberger made the decision to authorize the mass arrest based on reports he received that there had been a felony assault on police officers. (Neuberger Depo., p. 93.)  Sr. Cmdr. Neuberger admitted that he knew there was not probable cause to arrest everyone within the encirclement:

> Q.  Okay.  And I mean, did you know whether all the people being pushed in by the officers had -- had broken the law?
>
> A.  No.  I did not.
>
> Q.  Okay.  Did you know whether you had probable cause on all the people who were being pushed in?
>
> A.  No.  I did not.
>
> Q.  Okay.  So you knew that at least -- well, did you know that some of the people who were going to be arrested, you did not have probable cause on?
>
> A.  Yes, sir.

15

(Id. at 93-94.)

Lt. Clark also requested of and received permission from Sr. Cmdr. Neuberger to arrest all civilians within the encirclement. (Clark Depo., pp. 79-80.) Lt. Clark made this request even though he "wasn't sure who should have been arrested [and] who should not have been." (Id. at 81.) Lt. Clark was not sure if he had probable cause to arrest everyone in the encirclement. (Id. at 82.)

After the encirclement had been in place nearly nine minutes, an officer announced by loudspeaker to the encircled civilians, "Ladies and Gentlemen, you are now under arrest. Sit down and place your hands on top of your head." (Frazer Aff., Ex. D, 24:53.) Approximately 400 hundred civilians, including all of the plaintiffs, had been placed under arrest. (Frazer Aff., Ex. D, 16:00-24:53; Neuberger Depo., p. 110; Clark Depo., p. 74; 4th Tindal Aff., Exs. V-CC; 5th Tindal Aff., Exs. DD-II; 6th Tindal Aff., Exs. JJ-OO, RR, SS; 2nd Shulman Aff., Exs. 10-19; 3rd Shulman Aff., Exs. 20-23.) Cmdr. Frazer made the decision to give the arrest order. (Frazer Depo., p. 128.) The officers did not give any dispersal orders prior to the arrest announcement. (Frazer Aff., Ex. D, 16:00-24:53.) An officer periodically repeated the arrest announcement by loudspeaker. (Frazer Aff., Ex. D.) Sr. Cmdr. Neuberger wanted everyone in the encirclement handcuffed before deciding who would be released and who would be charged. (Neuberger Depo., p. 110.)

Cmdr. Frazer also knew that he had placed under arrest many persons for whom officers did not have probable cause:

Q. How many would you estimate -- how many persons would you estimate were removed who were innocent?

A. There were a lot. You know, it says several hundred there. I would say that's probably a better categorization than my 125 today. But I'd say close to that 200 number seems right to me. There were a lot of people. They weren't big groups,

but there were a lot of people sitting in twos, threes, fours, ones, twos in that area that were guided out in the process.

Q.  And why did you not remove the people you believed to be innocent from the encirclement before the arrest announcement?

A.  Because at that point, we did not want to give an opportunity for the people who had already attacked NRT 36 to know that anything was happening other than that they were being arrested.  And as you know and as we trained, you give that command that, "You are under arrest," then that closes a window on their ability by statute to flee or fight against us or deal with us.  And certainly, everyone in there was not free to walk out on their own, even the people that we walked out who weren't involved.  So "arrest" versus "detain," detain is probably a more accurate word for the couple hundred people that were walked out.

Q.  Well, when you're given -- the arrest order that was given by loudspeaker --

A.  Uh-huh.

Q.  -- that was intended to be heard by everybody in the encirclement?

A.  Without a doubt.

Q.  Okay.  And did you -- and before that order was given, you knew that you had approximately 200 people in the area within the encirclement who you did not have probable cause on?

A.  Correct.

(Frazer Depo., pp. 134-36.)

Out of the approximately 400 civilians placed under arrest, only approximately 160 arrestees were booked and taken into custody. (Frazer Depo., p. 137.)  Cmdr. Frazer was responsible for deciding who would be booked and who would be released. (Id. at 139.)  All persons booked were then taken into custody per the St. Paul Police Department's policy created for the RNC. (Id. at 146-47.)

Shortly after the first arrest announcement, arrest teams began entering the encirclement to handcuff and remove arrestees for booking. (Shulman Aff., Ex. 2, 6:53; Frazer Aff., Ex. D,

24:55-end.)  The process of handcuffing and removing arrestees was slow. (Frazer Aff., Ex. D, 24:55-end.)  The arrestees acted peacefully and compliantly during the handcuffing and removal process. (Frazer Aff., Exs. C, E.)  BCA video of the arrest site makes clear that most of the arrestees were not present at the intersection of Jackson St. and Shepard Rd. for the officers' initial use of force. (Frazer Aff., Ex. E.)  It took at least two hours to complete the process of clearing the park of the arrestees. (Frazer Aff., Ex. I.)

Neither the F.B.I., Secret Service, nor Homeland Security had any input into how the events on Shepard Rd. were handled. (Frazer Depo., pp. 187-88.)

### d. The Plaintiffs

The plaintiffs in this case were all corralled and arrested in the Shepard Rd. encirclement despite being present on Shepard Rd. for lawful purposes. (4th Tindal Aff., Exs. V-CC; 5th Tindal Aff., Exs. DD-II; 6th Tindal Aff., Exs. JJ-LL & SS; 2nd Shulman Aff., Exs. 10-19; 3rd Shulman Aff., Exs. 20-23.)  Plaintiffs Bernini, Rechitsky, and Phillips were present on Shepard Rd. as legal observers. (2nd Shulman Aff., Ex. 10; 5th Tindal Aff., Exs. DD, EE.)  Plaintiffs Cecil, Drew, Kahl, Hayes, Jackson, and Westlund were present on Shepard Rd. as volunteer medics. (2nd Shulman Aff., Exs. 11, 15; 4th Tindal Aff., Exs. X, Z; 5th Tindal Aff., Ex. II; 3rd Shulman Aff., Ex. 23.)  Plaintiffs Neef, Lanctot, Morse, and Rochfort were present on Shepard Rd. as members of the media. (2nd Shulman Aff., Ex. 19; 4th Tindal Aff., Ex. BB; 3rd Shulman Aff., Ex. 20, 21.)  Plaintiffs Hagy, Hayden, Solem, Ward, and Whitmore were present on Shepard Rd. because they were attempting to get to the concert on Harriet Island. (4th Tindal Aff., Ex. S, p. 9; 2nd Shulman Aff., Ex. 14; 5th Tindal Aff., Ex. GG; 6th Tindal Aff., Exs. SS, LL.)  Plaintiff Mainstream was present on Shepard Rd. to find a way to his job as a security guard. (4th Tindal Aff., Ex. AA.)  Plaintiffs Byrnes, Cohen, Kellan Dubbels, Kristofer Dubbels, Exum, Hundt, Johnson, Larson,

Ogle, Segner, Swift, Temperante, and Wilkinson were present on Shepard Rd. to protest or to observe the activities in downtown St. Paul that afternoon. (4th Tindal Aff., Exs. V, W, Y, CC; 2nd Shulman Aff., Exs. 12, 16, 17, 18; 6th Tindal Aff., Ex. JJ, KK; 5th Tindal Aff., Ex. FF, HH; 3rd Shulman Aff., Ex. 22.)

Plaintiffs Bernini, Cecil, Drew, Kellan Dubbels, Kristofer Dubbels, Exum, Hayden, Hayes, Jackson, Johnson, Larson, Mainstream, Morse, Neef, Phillips, Rechitsky, Rochfort, Segner, Temperante, and Westlund were corralled from within sight of the intersection of Jackson St. and Shepard Rd. (2nd Shulman Aff., Exs. 10-12, 14-18; 4th Tindal Aff., Ex. X, Z, CC, AA, BB; 3rd Shulman Aff., Exs. 20-23; 5th Tindal Aff., Exs. DD, EE, FF.)  Plaintiffs Byrnes, Cohen, Hagy, Hundt, Kahl, Lanctot, Ogle, Solem, Swift, Ward, Whitmore, and Wilkinson were well to the west of Jackson St. and Shepard Rd. and first encountered the police lines in the park or to the west of Jackson St. and Shepard Rd. (4th Tindal Aff., Exs. V, W, S, Y; 5th Tindal Aff., Exs. HH, II, GG; 2nd Shulman Aff., Ex. 19; 6th Tindal Aff., Exs. JJ, KK, SS, LL.)

Plaintiffs Bernini, Cecil, Cohen, Drew, Kellan Dubbels, Kristofer Dubbels, Exum, Hayes, Jackson, Johnson, Kahl, Morse, Ogle, Rochfort, Segner, Solem, Temperante, Westlund, Whitmore, and Wilkinson were injured by pepper spray, tear gas, or other police weapons. (2nd Shulman Aff., Exs. 10, 11, 12, 15, 16, 17, 18; 4th Tindal Aff., Exs. W, X, Z, BB: 5th Tindal Aff., Exs. HH, II, FF, GG; 6th Tindal Aff., Ex. JJ, LL; 3rd Shulman Aff., Exs. 21, 22, 23.)  Plaintiffs Kahl and Westlund sustained injuries from the over-tightening of handcuffs. (5th Tindal Aff., Ex. II; 3rd Shulman Aff., Ex. 23.)  All of the plaintiffs suffered emotional distress as the result of the incident. (4th Tindal Aff., Exs. V-CC; 5th Tindal Aff., Exs. DD-II; 6th Tindal Aff., Exs. JJ-LL & SS; 2nd Shulman Aff., Exs. 10-19; 3rd Shulman Aff., Exs. 20-23.)

Plaintiffs Cecil, Cohen, Drew, Kellan Dubbels, Kristofer Dubbels, Exum, Hagy, Hayden, Hayes, Jackson, Johnson, Kahl, Lanctot, Larson, Mainstream, Morse, Neef, Rochfort, Segner, Solem, Swift, Temperante, Ward, Westlund, Whitmore, and Wilkinson were charged with crimes and taken into custody for up to 72 hours. (4th Tindal Aff., Exs. V-CC; 5th Tindal Aff., Exs. DD-II; 6th Tindal Aff., Exs. JJ-LL & SS; 2nd Shulman Aff., Exs. 10-19; 3rd Shulman Aff., Exs. 20-23.)  The remaining plaintiffs were released from the encirclement without criminal charges. (2nd Shulman Aff., Ex. 10; 4th Tindal Aff., Exs. V, Y; 6th Tindal Aff., Ex. JJ; 5th Tindal Aff., Exs. DD, EE)  All charges against the plaintiffs were dismissed. (4th Tindal Aff., Exs. V-CC; 5th Tindal Aff., Exs. DD-II; 6th Tindal Aff., Exs. JJ-LL & SS; 2nd Shulman Aff., Exs. 10-19; 3rd Shulman Aff., Exs. 20-23.)

### III.   ARGUMENT

#### a.   Standard

Summary judgment is only to be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  On such a motion, the court must view the facts in the light most favorable to the nonmoving party and give that party all reasonable inferences that can be drawn from them. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A party opposing summary judgment is entitled to "the benefit of all reasonable inferences" to be drawn from the facts presented. *Kukla v. Hulm*, 310 F.3d 1046, 1047-48 (8th Cir. 2002).

Though the determination of whether an official is entitled to qualified immunity is a question of law, when there is a genuine dispute concerning the predicate facts material to the qualified immunity issue, summary judgment is not appropriate. *Turney v. Waterbury*, 375 F.3d

756, 759-60 (8th Cir. 2004).  Here, the evidentiary record is replete with genuine issues of material fact concerning qualified immunity, and defendants' motion should be denied.

### b.      Defendants Are Not Entitled to Qualified Immunity

To avoid summary judgment based on qualified immunity, plaintiffs must establish (1) that the facts, taken in the light most favorable to them, "show that the officer's conduct violated a constitutional right" and (2) that the right was "clearly established." *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005) (citations omitted).  "A right is clearly established when that right is so clear that a reasonable officer would understand that what he is doing violates that right." *Craighead*, 399 F.3d at 962 (citation omitted).

### 1.      Defendants Violated Plaintiffs' Right to Be Free from Arrest without Probable Cause

"It is firmly established that, to comport with the Fourth Amendment, a warrantless search or seizure must be predicated on particularized probable cause." *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006).  "Probable cause to make an arrest requires a showing that the police had 'enough information to 'warrant a man of reasonable caution in the belief' that a crime has been committed and that the person arrested has committed it.'" *Id.* at 572. (citations omitted).  "[A] search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another…" *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

It is a violation of the Fourth Amendment for officers to conduct a mass arrest when they arguably have probable cause to believe that only some of the arrestees committed a crime. *Barham*, 434 F.3d at 573.  Officers are not permitted to impute probable cause to the innocent based on the random criminal act of others:

Throughout this litigation, however, appellants have tried to excavate probable cause not from the official reason for arrest, but from the scattered acts of lawlessness that Newsham and others had witnessed that morning. While Newsham is correct that an arrest may pass Fourth Amendment muster even if the only objectively discernible probable cause related to conduct far removed from the offense charged by the arresting officer, [citation omitted] he has failed to show any objective basis for arresting the entire mass of people who happened to inhabit the park. Quite simply, Newsham had no basis for suspecting that all of the occupants of Pershing Park were then breaking the law or that they had broken the law before entering the park. Vague allegations that "demonstrators" committed offenses will not compensate for this shortcoming.

*     *     *

Traffic offenses and scattered acts of vandalism by unidentified individuals in the streets, however, could not have incriminated all of the individuals who happened to occupy the park when Newsham ordered the arrest.  Even to the extent that Newsham asserts that some "demonstrators" were unlawfully assembled in the park, he has made no effort to ascribe misdeeds to the specific individuals arrested. Nowhere have appellants suggested that the particular individuals observed committing violations were the same people arrested; instead, they refer generically to what "demonstrators" were seen doing. This is the upshot of making arrests based on the plaintiffs' occupancy of a randomly selected zone, rather than participation in unlawful behavior. While we have no reason to doubt that unlawful activity might have occurred in the course of the protest-with some individuals engaging in disorderly conduct, for example-the simple, dispositive fact here is that appellants have proffered no facts capable of supporting the proposition that Newsham had reasonable, particularized grounds to believe every one of the 386 people arrested was observed committing a crime.

*Barham*, 434 F.3d at 573-74.

Moreover, police efforts to quell unruly demonstrations do not limit civilian Fourth

Amendment rights:

Our case law addressing large-scale demonstration scenarios does not suspend-or even qualify-the normal operation of the Fourth Amendment's probable cause requirements. Rather, this case law merely amplifies one essential premise that has a bearing on the case at hand: when compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protestors, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order.

*Barham*, 434 F.3d at 575.

Here, defendants contend that they had probable cause to arrest plaintiffs because (1) "officers came under siege from a barrage of rocks, urine, feces and other makeshift weapons thrown by the assembled crowd," (2) "the crowd was working in concert"; and (3) "at least eight warnings were given to the crowd explaining they would be arrested if they did not disperse." (Defts' Memo., p. 21.) Plaintiffs have brought forth ample evidence showing that defendants' claimed bases for the arrests are false and that defendants have admitted arresting as many as 200 civilians without probable cause. Because of these genuine disputes concerning the predicate facts material to the qualified immunity issue, summary judgment is not appropriate. *Turney*, 375 F.3d at 759-60.

To begin, plaintiffs' answers to interrogatories and requests for admissions flatly refute defendants' contentions that there was an assault on the police and that dispersal orders were given. None of the plaintiffs observed law enforcement officers on Shepard Rd. give dispersal orders. (4th Tindal Aff., Exs. V-CC; 5th Tindal Aff., Exs. DD-II; 6th Tindal Aff., Exs. JJ-OO, RR, SS; 2nd Shulman Aff., Exs. 10-19; 3rd Shulman Aff., Exs. 20-23; Clark Depo., p. 64.) The plaintiffs also did not do anything to disobey or threaten any officers. (4th Tindal Aff., Exs. V-CC; 5th Tindal Aff., Exs. DD-II; 6th Tindal Aff., Exs. JJ-OO, RR, SS; 2nd Shulman Aff., Exs. 10-19; 3rd Shulman Aff., Exs. 20-23.) No plaintiff threw anything or saw anyone else throw anything at law enforcement officers on Shepard Rd. (6th Tindal Aff., Ex. QQ; 3rd Shulman Aff., Exs. 24-29; 4th Shulman Aff., Exs. 30-30; 5th Shulman Aff., Exs. 40-49; 6th Shulman Aff., Exs. 50-54.) Finally, none of the plaintiffs was part of the small group that attempted to cross the street behind the signs. (6th Tindal Aff., Ex. QQ; 3rd Shulman Aff., Exs. 24-29; 4th Shulman Aff., Exs. 30-30; 5th Shulman Aff., Exs. 40-49; 6th Shulman Aff., Exs. 50-54.) Because the court must view the facts in the light most favorable to the nonmoving party, here plaintiffs, this evidence

alone is sufficient to establish that there was no probable cause to support plaintiffs' arrests. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

In addition, there is video footage that shows that the attack on the officers never happened and that no dispersal warnings were ever given.  The video shows that the so-called protester group was not interfering with traffic or acting in an unruly manner as it walked eastbound down Shepard Rd. towards the intersection with Jackson St. (Shulman Aff., Ex. 5, 00:00-00:56.)  Next, when the group reached Jackson St. and Shepard Road, the video shows them waiting on the south side of Shepard Rd. (First Tindal Aff., Ex. B, 00:30-01:25; Shulman Aff., Ex. 4, 00:00-00:45.)  Contrary to defendants' claims of a 400-person mob, there appeared to be approximately 30-40 civilians on the sidewalk on the south side of Shepard Rd across from the NRT 36 officers. (Shulman Aff., Ex. 4, 00:00-00:45.)  Next, the video shows that the officers did not give any orders or directions to the civilians, and no one was throwing anything at the officers. (First Tindal Aff., Ex. B, 00:30-01:25; Shulman Aff., Ex. 3; Ex. 4, 00:00-00:45; Ex. 5, 01:25-02:15.)

Then transpires the only action that could have been remotely threatening to the officers: a small group of approximately ten to fifteen civilians huddled behind two signs and tried to cross Shepard Rd. toward the officers. (First Tindal Aff., Ex. B, 01:25-01:30; Shulman Aff., Ex. 3; Ex. 5, 01:25-02:15.)  The video shows that when the small group reached the median, without warning, the officers began to attack the civilians behind the signs and others with stinger blast balls, smoke, and other non-lethal weapons. (First Tindal Aff., Ex. B, 01:30-3:30; Shulman Aff., Ex. 3; Ex. 4, 00:45-02:40; Ex. 5, 02:19-03:30.)  The video footage shows that at no time did any civilian throw anything at the officers. (First Tindal Aff., Ex. B, 01:45-3:30; Shulman Aff., Ex. 4, 01:49-02:26; Ex. 5, 02:30-03:30.)  To the contrary, the officers' use of force produces a near

24

constant retreat by the civilians. (First Tindal Aff., Ex. B, 01:30-02:45; Shulman Aff., Ex. 3, Ex. 4, 00:45-02:40; Ex. 5, 02:30-02:50.)  On these facts, defendants cannot make an arguable showing of "particularized probable cause" for each plaintiff, and plaintiffs have established a violation of a constitutional right. *Barham*, 434 F.3d at 573.

Recognizing their lack of evidence of any wrongdoing on Shepard Rd. by the civilians subjected to the mass arrest, defendants "have tried to excavate probable cause not from the official reason for arrest, but from the scattered acts of lawlessness" that occurred at other locations and times within downtown St. Paul. *Barham*, 434 F.3d at 573.  Such evidence does not support probable cause because it fails to "ascribe misdeeds to the specific individuals arrested." *Id.*

For example, the video attached as Exhibit B to Cmdr. Frazer's affidavit does not show events on Shepard Road.  Cmdr. Frazer states at Paragraph 6 of his affidavit, "At 6:41 p.m., the video shows some of the items used and w[o]rn by protestors at Jackson including gas masks."  Cmdr. Frazer neglects to specify, however, that the items videotaped were from an incident at Jackson St. and 7th – not from Jackson St. and Shepard Rd.  Similarly, Exhibit 1 to the Affidavit of Jason Anderson is a 54-minute video that purports to set out all of the lawlessness in downtown St. Paul on September 1.  Of those 54 minutes of video, however, <u>only approximately the last two minutes</u> depict events on Shepard Rd.  The court in *Barham* rejected the use of "scattered acts of lawlessness" to build a case for probable cause, and this Court should too.

*Barham* is remarkably similar to the instant case.  In *Barham*¸ the plaintiffs were arrested in a mass arrest under the following circumstances:

> Plaintiffs… were detained when police officers, following the order of Assistant Chief Peter Newsham, cordoned off the perimeter of Pershing Park in northwest Washington, D.C. and arrested everyone there. Newsham purported to have witnessed widespread infractions that morning by "demonstrators," including

traffic violations and scattered acts of vandalism. After observing activities in Pershing Park for about an hour-during which pedestrian traffic flowed freely in and out of the park-Newsham issued the arrest order… Newsham and Ramsey concede that the mass arrest was executed with no prior warning to the occupants of the park to disperse and no warning to them that arrest was imminent. In the end, 386 people were arrested.

434 F.3d at 568. In rejecting the claim of qualified immunity by Newsham, the D.C. Circuit held,

Undisputed evidence reveals that Newsham arrested an undifferentiated mass of people on the basis of crimes committed by a handful of individuals who were never identified. Because nothing in the record suggests that Newsham had particularized probable cause to arrest each of the 386 persons caught in the police sweep, [citation omitted], his claim to qualified immunity raises no genuine issue as to any material fact [citation omitted].

*Id.* Similarly, defendants here ordered the arrest of "an undifferentiated mass of people," and thus did not have probable cause to do so.

Most telling on the question of whether the arrestees were "an undifferentiated mass of people" is the testimony of the defendants themselves. Sr. Cmdr. Neuberger had an "arrest first, identify suspects second" approach to the mass arrest:

Q. Okay. And I mean, did you know whether all the people being pushed in by the officers had -- had broken the law?

A. No. I did not.

Q. Okay. Did you know whether you had probable cause on all the people who were being pushed in?

A. No. I did not.

Q. Okay. So you knew that at least -- well, did you know that some of the people who were going to be arrested, you did not have probable cause on?

A. Yes, sir.

26

(Neuberger Depo., pp. 93-94.)  Cmdr. Frazer shared Sr. Cmdr. Neuberger's approach:

> Q.  How many would you estimate -- how many persons would you estimate were removed who were innocent?
>
> A.  There were a lot.  You know, it says several hundred there.  I would say that's probably a better categorization than my 125 today.  But I'd say close to that 200 number seems right to me.  There were a lot of people…
>
> *          *          *
>
> Q.  Okay.  And did you -- and before that order was given, you knew that you had approximately 200 people in the area within the encirclement who you did not have probable cause on?
>
> A.  Correct.

(Frazer Depo., pp. 134-36.)  Under *Barham*, this failure to differentiate between actual criminal suspects and innocent civilians defeats defendants' claim to even arguable probable cause.

Defendants attempt to skirt the probable cause requirement by relying on *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009).  *Carr* stands for the unremarkable proposition that where "the crowd acted unlawfully as a unit," there is probable cause to arrest all members of the unit. 587 F.3d at 408.  As discussed above, however, the defendants themselves have admitted that they arrested civilians whom they knew to be separate from the allegedly unlawful "unit."  *Carr* thus does not support the defendants' contention here.

In addition, the video footage submitted by plaintiffs on this motion shows that at most 10-15 civilians took an action that could even be construed to be threatening towards the police, *i.e.,* walking towards the police with the signs.  When this occurred, the video footage shows that there were only approximately 30-40 persons at the intersection.  Yet defendants ordered the arrest of approximately 400 civilians.  Thus, there were over 350 civilians arrested who were not even present for the attempted crossing of the street by a group of 10-15 civilians.  On these

27

facts, defendants cannot come close to meeting the "act[ing] unlawfully as a unit" standard of *Carr*.

The individual circumstances of each plaintiff also make clear that they and many others were not "act[ing] unlawfully as a unit."  The plaintiffs were pursuing activities at the time of the incident as diverse as trying to get to the concert on Harriet Island, acting as members of the media, volunteer medics, and legal observers, and walking with protesters.  Moreover, they were all swept up in the encirclement at different points on Shepard Rd.:  some were near the intersection of Jackson St. and Shepard Rd., some were at points in between the park and Jackson St., while others were encircled in the park itself.  On the facts before this Court, which must be construed in the light most favorable to plaintiffs, defendants cannot meet the "act[ing] unlawfully as a unit" standard of *Carr,* and their motion should be denied. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

It is noteworthy that *Carr* reverses a grant of summary judgment to the plaintiffs and remanded the case for trial; the court did not grant summary judgment to the defendant officers.  As here, the officers and the arrestees presented competing views of the incident.  In reversing the summary judgment in plaintiffs' favor, the Court noted that these competing views of the evidence constitute an "issue for the jury." 587 F.3d at 409.  The record before this Court also presents "genuine issue[s of]… material fact" to be resolved by the jury. Fed. R. Civ. P. 56(c).

Finally, there are other holes in defendants' claimed evidence.  For example, at Paragraph 11 of his affidavit, Cmdr. Frazer states that the photographs in Exhibit G to his affidavit depict the evidence remaining at Jackson St. and Shepard Rd. and "include bags and remnants of fecal matter, homemade bombs/fireworks, large concrete rocks, wrist rockets and ball bearings."  The photographs in fact show very little.  There is a single broken plastic bag with what appears to be

28

some type of animal feces – not bags, as Cmdr. Frazer claims.  There is a photo of some type of brown stain on the sidewalk, but it is not near the single plastic bag.  There is a single photo of three rocks on the ground: two small rocks and one larger rock.  There is some type of equipment photographed, but it is difficult to determine what it is or where it was photographed, as Cmdr. Frazer did not take the photos himself.  Finally, there is a single plastic bag containing some ball bearings.  This paltry evidence does not support defendants' account of an all-out assault on them.

In addition, at Paragraph 3 of her First Affidavit, Ms. Tindal states that at 2:22:19, Exhibit B to her affidavit shows "a smoke agent [  ] thrown very close to officers."  The video attached as Exhibit B does show a puff of smoke at that point, but it appears to come from the smoke agents used by officers against the crowd.  By that point on the video, the officers had already begun using smoke against the crowd and were moving the crowd to the west.  Also, Sgt. Henry described the alleged firework smoke as "black gun-powdery smoke." (Henry Depo., p. 129.)  Exhibit B, however, shows white smoke.  Ms. Tindal also states in Paragraph 3 of her First Affidavit that Exhibit B shows the "number of protestors far outnumbered the number of officers."  Exhibit B shows, however, that the persons on the sidewalk were compliant with the officers in that they were moving west along Shepard Rd. in response to the weapons used by the officers and the movement of the officers.  In sum, plaintiffs have presented this Court with ample evidence to create genuine issues of material fact on whether there was arguable probable cause for the mass arrest.

     2.     **The Right to Be Free from Arrest without Probable Cause Was Clearly Established**

"A right is clearly established when that right is so clear that a reasonable officer would understand that what he is doing violates that right." *Craighead*, 399 F.3d at 962 (citation

omitted).  Here, the decision-makers for the mass arrest, Sr. Cmdr. Neuberger, Cmdr. Frazer, and

Lt. Clark, were all seasoned, highly-trained law enforcement officers who knew that they had to

have probable cause to arrest a suspect.  Moreover, the decision to make the mass arrest was

taken after careful deliberation and the movement of officer lines to encircle the arrestees.  The

right to be free from arrest without probable cause under these conditions was thus "clearly

established," and defendants' motion should be denied.

Particularly instructive on this point is *Beal v. City of Chicago*, 2007 WL 1029364

(N.D.Ill. March 30, 2007).  In *Beal*, Chicago police officers arrested approximately 500

protesters for allegedly disobeying police orders and obstructing traffic.  In conducting the

qualified immunity analysis, the court held,

> Thus, probable cause for arrest existed if a marcher engaged in violent or
> obstructive conduct or if a marcher refused to obey a lawful order to disperse after
> fair notice and an opportunity to comply. Absent such circumstances, no probable
> cause existed and Plaintiffs had a clearly established right to be free from arrest.

*Beal*, 2007 WL 1029364, p. 5.  With respect to innocent civilians present, the court further held,

"[a]ssuming that certain marchers committed violent or obstructive acts, the CPD nevertheless

must have given other peaceful marchers a lawful order to disperse prior to arresting them."

*Beal* is entirely consistent with defendants' training and planning for the RNC.  Absent

exigent circumstances, defendants were instructed that they were to issue a formal warning at

regular intervals prior to making a mass arrest. (Neuberger Depo., pp. 145-46; 6th Shulman Aff.,

Ex. 58.)  Furthermore, in their training, the defendants were instructed on constitutional

principles relevant to making arrests, the use of force, and the First Amendment. (6th Shulman

Aff., Ex. 55)  The training also discussed the First and Fourth Amendments in the context of civil

disorder. (6th Shulman Aff., Ex. 57.)  Finally, defendants studied how other cities handled civil

disturbances where mass arrests were made. (6th Shulman Aff., Ex. 56.)  After all of this training,

defendants understood that they had to have probable cause to make an arrest and that dispersal

warnings were required in the event law enforcement determined that an assembly was in

violation of the law. (Neuberger Depo., p. 12; Frazer Depo., pp. 10-11, 230; Clark Depo., pp. 15-

16.)  Accordingly, "a reasonable officer would understand" that arresting hundreds of civilians

for the purpose of apprehending a handful of alleged suspects violates the Fourth Amendment

prohibition against arrests without probable cause. *Craighead*, 399 F.3d at 962 (citation omitted).

>   3.      Defendants Have Violated Plaintiffs' First Amendment Rights

Though there is virtually complete overlap between the two claims, with respect to

plaintiffs' claim that their First Amendment rights were violated by the mass arrest,

> [t]he Constitution mandates that access to the streets, sidewalks, parks and other
> similar public places for the purpose of exercising First Amendment rights cannot
> be denied broadly and absolutely. [citation omitted]  Restrictions on the time and
> place of demonstrations and the conduct of demonstrators of course must not be
> used as a subterfuge for the suffocation of speech. It is axiomatic however that the
> police may, in conformance with the First Amendment, impose reasonable
> restraints upon demonstrations to assure that they be peaceful and not
> obstructive.[citation omitted] And by the same token the First Amendment
> permits the police to contain or disperse demonstrations that have become violent
> or obstructive.

*Washington Mobilization Committee v. Cullinane*, 566 F.2d 107, 119 (D.C.Cir. 1977) (footnote

omitted).  More specifically:

> Officers are charged with the knowledge that each marcher had a right to exercise
> his First Amendment rights, free from arrest, unless the marcher engaged in
> violent or obstructive conduct or refused to obey a lawful order to disperse after
> fair notice was given to him and he was given an opportunity to comply with that
> order. Thus, absent a reasonable belief that such circumstances existed, the
> Officers had a duty to refuse to arrest the marchers or to intervene and prevent the
> arrests. The law requires that an Officer cannot simply assume that because he is
> given an order to arrest that probable cause must have existed.

*Beal*, 2007 WL 1029364.  Here, defendants denied plaintiffs access to the sidewalks and parks of

St. Paul without valid justification all on account of their perception of them as "protesters."

Defendants' conduct thus constitutes "suffocation of speech," and plaintiffs' have established a

violation of their First Amendment rights.

Sr. Cmdr. Neuberger decided to clear downtown of all groups on foot because he had

declared the entire downtown to be a crime scene.  It is clear that by excluding all groups on

foot, he meant protester groups, whether law-abiding or not:

> Q.  What about individuals who were on foot about whom you did not have any information that they were violent?
>
> A.  It would depend on the location.  But in general, I would -- if it was a large group, my guess would be that they would have been, you know, moved out of downtown also.
>
> Q.  Well, you said your guess.  You know for a fact that at least from Shepard Road, no groups were allowed to walk back into downtown after about 4 p.m. on the 1st.  Right?
>
> A.  Correct.
>
>                        *        *        *
>
> Q.  Are you saying that there were no law-abiding citizens on Shepard Road on the afternoon of September 1st who sought to get back into downtown by either Jackson or Shepard?
>
> A.  I'm not saying that.
>
> Q.  Or Jackson or Sibley?  Sorry.
>
> A.  No.  I'm not saying that, that there -- there were no law-abiding -- or that -- if I understand your question, I'm not saying everybody on Shepard Road was a criminal.
>
>                        *        *        *
>
> Q.  Well, would you agree that you kept out of downtown St. Paul people who were law-abiding on the afternoon of September 1st?

A.  Potentially, yes.  There was a period of time that we established a police cordon, like we would do a crime scene, and till we could figure out who was what.

Q.  And were you troubled at all about keeping out people who were law-abiding?

A.  Well, at that point, we didn't know who was and who wasn't.

Q.  So it was keep people out first, decide who was law-abiding second?

A.  Establish the law enforcement presence and control, yeah.  Reestablish a -- a presence, you know, to -- to make sure that the folks that were there were, in fact, law-abiding. Because it was -- leading up to it, again, as we said, it was out of -- I said it was out of control.

Q.  Was all of downtown a crime scene on the afternoon of September 1st, 2008?

A.  In a broad sense, yes.

(Neuberger Depo., pp. 44-47.)

Sr. Cmdr. Neuberger elaborated on this clearing of downtown by admitting that individuals or very small groups, *i.e.*, ones that could not be considered protest groups, were allowed entrance into downtown:

Q.  Once -- well, once at -- once NRT 36 was at Jackson and Sibley, could individuals have
walked --

A.  Yes.

Q.  -- past them up Sibley and Jackson?

A.  Yes.  Yes.

Q.  Okay.  Did you make that clear to NRT 36?

A.  As far as like a specific command, no.

Q.  Okay.  What -- on what do you base your statement that individuals could have walked past NRT 36 on Jackson or Sibley towards downtown?

A.  That -- well, we had been operating for most of the afternoon under that premise, that if there was one or two or three or four and -- and they didn't outwardly appear to be causing any problems, they had free reign of downtown.

Q.  Okay.

A.  Had been going on all afternoon.

Q.  What about a family of five, two parents, three small children, would they have been allowed to enter downtown from Shepard Road on Jackson or Sibley?

A.  I would have hoped so, yes.

Q.  Okay.  What about a group of ten, so we're talking maybe two parents, a couple of aunts and uncles, and, say, six kids?

A.  Again, it's going to be situationally dependent, who are they with and what are they doing.  If it's just this family unit, is that what you're saying?

Q.  Yes.

A.  Then I would have hoped that they would have.

Q.  What about a 21-year-old wearing dark clothes and a hoodie?

A.  As an individual?

Q.  Yeah.

A.  Don't know.  Again, it would have been situationally dependent by the NRT team.

Q.  Okay.

A.  I would like to think they would have.  But again, given what had been going on all day and sort of the -- the MO of the anarchists and the protesters, if they were -- if they were -- face was covered, hoodie, mask, things like that, probably not.

Q.  Okay.  I mean, did you provide some training or criteria to NRT 36 on who would be allowed back into downtown St. Paul and who wouldn't?

A.  Not specific.  It was common sense.


(Neuberger Depo., pp. 50-52.)

34

Though the civilians on Shepard Rd., including plaintiffs, were law-abiding, they had no chance of entering downtown because defendants believed them to be "protesters." (Clark Depo., pp. 41-42; Tindal Aff., Exs. K, L, M, N.)  This barring of plaintiffs from downtown and their resulting arrest was not a reasonable restraint on speech, when other individuals who did not appear to be "protesters" were allowed access into the downtown area.  Moreover, many of the plaintiffs were in fact engaging in classic First Amendment conduct, from legal observing to acting as a member of the media to following a small protest group.  In addition, defendants had information that only a "small minority" of the thousands of protesters in St. Paul was responsible for the alleged criminal acts. (3rd Tindal Aff., Ex. K.)  Under *Washington Mobilization Committee*, defendants' singling out of "protesters" under these circumstances is violative of the First Amendment, and their motion must thus be denied.

Finally, there can be little doubt that plaintiffs' First Amendment right to circulate peacefully in a downtown area was "clearly established" at the time of these events. *Craighead*, 399 F.3d at 962 (citation omitted).

4.     Defendants Have Violated Plaintiffs' Right to Be Free from the Use of Excessive Force

Plaintiffs have also brought claims of excessive force.  In determining whether defendants' used excessive force against plaintiffs, this Court must apply the "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989).  "Force is excessive when an officer's actions are not objectively reasonable in light of the facts and circumstances confronting him." *Kukla,* 310 F.3d at 1050 (citation omitted).  A reviewing court is not to take into account the officer's "underlying intent or motivation." *Graham*, 490 U.S. at 397.  In making the reasonableness determination, courts consider the totality of the circumstances, including the severity of the crime, whether the suspect posed a threat to the officer's safety, and

35

whether the suspect resisted arrest. *Adewale v. Whalen*, 21 F.Supp.2d 1006, 1014 (D.Minn. 1998).  Here, defendants used force against plaintiffs in a gratuitous, unnecessary way, and their use of force was therefore excessive.

Sgt. Henry's authorization of the use of weapons by NRT 36 against the civilians on the sidewalk, including plaintiffs, was not "objectively reasonable" because the civilians were complying with the movement of the officers and posed no threat to the officers.  The video makes clear that the civilians moved west on the sidewalk, away from the officers, in response to the officers' use of stinger blast balls against the civilians who tried to cross the road. (First Tindal Aff., Ex. B, 01:30-02:15; Shulman Aff., Ex. 3, Ex. 4, 00:45-02:40; Ex. 5, 02:30-02:50.) Notwithstanding that movement westward, NRT 36 and CART Team 6 continued to use smoke, blast balls, and other non-lethal weapons against the crowd. (First Tindal Aff., Ex. B; Shulman Aff., Ex. 3, Ex. 4, 01:49-05:35; Ex. 5, 02:30-03:30.)  At no time did anyone throw anything at the officers. (First Tindal Aff., Ex. B, 01:45-3:30; Shulman Aff., Ex. 4, 01:49-02:26; Ex. 5, 02:30-03:30.)  There was thus no justification for the continued use of force against the civilians.

Most disturbing was the officers' decision to throw smoke or gas canisters directly into the westbound crowd on the sidewalk. (Shulman Aff., Exs. 1, 3, Ex. 4, 04:35-05:35.)  There was no provocation or resistance from the crowd to prompt this use of force. (Shulman Aff., Exs. 1, 3, Ex. 4, 04:35-05:35.)  This forced civilians to walk or run through the gas to continue moving westbound, the direction the officers wanted them to move. (Id.)  Also, one officer repeatedly used pepper spray against civilians who were walking westbound on the sidewalk. (Shulman Aff., Ex. 4, 04:45-05:05.)  Because there was no threat or resistance from the civilians, the officers' use of force was not "objectively reasonable," and plaintiffs have established that their

Fourth Amendment right to be free from the use of excessive force was violated. *Kukla,* 310 F.3d at 1050 (citation omitted).

Defendants argue that plaintiffs cannot maintain their excessive force claims because the officers' use of force was de minimus. (Defts' Memo., p. 26.)  Plaintiffs' counsel is not aware of any cases holding that the level of force used by officers in this case is de minimus, and defendants have not cited any.  The video footage of the gas, smoke, pepper spray, and stinger blast balls used by the officers show that a very high level of force was used.  Moreover, the effects of the gas and pepper spray were painful for those plaintiffs exposed to it.  Essentially, defendants argue that the Fourth Amendment does not apply to the level of force used against plaintiffs in this case.  No court has ever adopted such a rule of law, and this Court should not be the first.

     5.     The Right to Be Free from the Use of Excessive Force Is Clearly Established

Sgt. Henry, who authorized the use of weapons by NRT 36 against the civilians, understood that he was only allowed to use objectively reasonable levels of force against suspects. (2nd Tindal Aff., Ex. G, Henry Depo., p. 11.)  Moreover, Sgt. Henry received extensive training about the Fourth Amendment and its prohibition against the use of excessive force.  On September 1, 2008, therefore, Sgt. Henry clearly would have known that it was unlawful to gas and pepper spray compliant civilians, and plaintiffs have satisfied the second prong of the qualified immunity analysis. *Craighead*, 399 F.3d at 962 ("A right is clearly established when that right is so clear that a reasonable officer would understand that what he is doing violates that right.")

     **c.  Neuberger Was a Decision-maker with Final Authority for the Mass Arrest and Therefore Created City Policy**

Sr. Cmdr. Neuberger's decisions (1) to clear downtown of protesters; and (2) to carry out the mass arrest constitute decisions of a City employee with final authority to make them, rendering the City liable under 42 U.S.C. § 1983.  "Municipal liability may attach based on the single act or decision of a municipal decisionmaker if the decisionmaker possesses final authority to establish municipal policy over the subject matter in question." *Speer v. City of Wynne*, 276 F.3d 980, 987 (8th Cir. 2002)(citation omitted).  "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  The U.S. Supreme Court has stated,

> [A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood.  More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.
>
>                 *        *        *
>
> …We hold that municipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Pembaur*, 475 U.S. at 481, 483.  Here, it is clear that Sr. Cmdr. Neuberger had final authority on law enforcement decisions made on the streets of downtown St. Paul on September 1, 2008. Under *Pembaur*, therefore, the City is liable for those decisions.

Sr. Cmdr. Neuberger's position on September 1, 2008 was Senior Commander in charge of mobile field force command post operations for the RNC. (2nd Tindal Aff., Ex. F, Neuberger Depo., pp. 5, 10.)  He was responsible for directing five MFF's, comprising nearly 500 law enforcement officers. (Neuberger Depo., p. 13.)  The actions of MFF's, including the use of riot

control agents, had to be approved by Sr. Cmdr. Neuberger, absent exigent circumstances.

(Frazer Depo., pp. 31-33.)  Using this authority, Sr. Cmdr. Neuberger made the decisions to clear

the downtown area of all groups on foot and to direct that the mass arrest be carried out.  Sr.

Cmdr. Neuberger has not suggested that he had to obtain approval from any other official or

governmental body to make these decisions affecting hundreds, if not thousands, of civilians.  In

his official capacity, Sr. Cmdr. Neuberger made "deliberate choice[s] to follow a course of

action" on behalf of the City, and the City must now face liability for his policy-making actions.

*Pembaur*, 475 U.S. at 483.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this Court deny defendants'

motion.

Dated:  October 8, 2010                  LAW OFFICE OF DAVID L. SHULMAN PLLC


                                         s/ David L. Shulman_____
                                         David L. Shulman (#260721)
                                         Law Office of David L. Shulman
                                         1005 W. Franklin Ave., Suite 3
                                         Minneapolis, MN 55405
                                         Tel: 612-870-7410
                                         Fax: 612-870-7462

                                         Robert J. Kolstad (#258994)
                                         2249 E. 38th St., #8
                                         Minneapolis, Minnesota 55407
                                         Telephone:  612-721-3425

                                         R. Travis Snider (#270842)
                                         Snider Law Firm, Ltd.
                                         1005 W. Franklin Avenue, Suite 3
                                         Minneapolis, MN  55405
                                         Telephone: 612-872-1200

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(d)**

I hereby certify that this memorandum of law, exclusive of the caption, signature text, and this certification, contains 11,968 words, counted using Microsoft Word 2002 and applied to include all text, including headings, footnotes, and quotations.

Dated:  October 8, 2010                    LAW OFFICE OF DAVID L. SHULMAN PLLC

                                           s/ David L. Shulman                          
                                           David L. Shulman (#260721)
                                           Law Office of David L. Shulman
                                           1005 W. Franklin Ave., Suite 3
                                           Minneapolis, MN 55405
                                           Tel: 612-870-7410
                                           Fax: 612-870-7462