UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Brook Bernini, Matthew Byrnes, Simon Cecil, Andrew Cohen, David Drew, Jr., Alana Michelle Exum, Bobby Reese Hagy, Jr., Adryn Hayes, Kevin Hundt, Rachel Jackson, Tiana Johnson, Garth Kahl, Jared Lanctot, Michael Larson, Vain Mainstream, Craig Neef, Mary Ogle, Tim Phillips, Raphi Rechitsky, Lambert Rochfort, Nick Segner, Ryan Solem, Zach Swift, Andrew Temperante, Michael Ward, II, Rachel Westlund, Nelson Whitmore, Kellan Dubbels, Kristofer Dubbels, David Morse, Bruce Wilkingson, and Adam Hayden, on behalf of themselves and all others similarly situated, <br><br>Plaintiffs, <br><br>v. <br><br>City of St. Paul, Steven Frazer, Joe Neuberger, Axel Henry, Patricia Englund, and Matthew Clark, <br><br>Defendants. | Civil No. 09-2312 (PAM/JJG) <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on Defendants' Motion for Summary Judgment. For the reasons that follow, and as stated at the Motion hearing, the Motion is granted.

**BACKGROUND**

In the late afternoon of September 1, 2008, the first day of the Republican National Convention, a group of people walked east on Shepard Road, along the Mississippi River in

downtown St. Paul, Minnesota. The parties dispute the size of the group, but it was substantial by any measure—from the 35-40 claimed by Plaintiffs to the hundreds claimed by Defendants. Police were stationed at the two street entrances to downtown St. Paul along Shepard Road: Jackson Street and Sibley Street. There were approximately 11 officers at each entrance. Because of railroad tracks running parallel to Shepard Road and between Shepard and downtown, there are limited access points from Shepard into downtown.

Shepard Road was an important artery into downtown during the Convention. Delegate buses were routed on Shepard because side streets in downtown were closed to traffic. Shepard offered direct access to the Xcel Energy Center and RiverCentre, where the Convention was held. Shepard was also designated an emergency route and was to be kept clear for emergency vehicles. Further, the First Lady was scheduled to appear at the Convention in the evening of September 1, and her motorcade planned to use Shepard Road to reach the Convention hall.

All permitted protests for the Convention had ended at 3:00 pm. Several of the protests during the day had turned violent, with several incidents of property damage being reported, including vandalism to squad cars and broken windows. The police were understandably a bit on edge. At some point in the afternoon, the officer in charge, Senior Commander Neuberger, gave the order to clear the downtown area and not to allow entrance to downtown for most civilians. He gave this order to "reestablish control [and] reestablish law enforcement presence" in the area around the Convention. (Neuberger Dep. at 38-39, 43-44.)

At about 4:30 pm, a portion of the group on Shepard started to cross Shepard towards Jackson Street. The crossing group was relatively small—approximately 20 individuals. The group remaining on the south side of Shepard was considerably larger. According to police officers, the large group was chanting and yelling, and appeared to be working in concert with the group crossing the street. Plaintiffs contend that they were not among the group of people crossing the street.

Here the stories of the incident diverge considerably. Plaintiffs contend that the police began firing stinger blast balls; the police officers contend that the group began throwing items at the officers, including large rocks and bags of feces, and that they did not begin firing until after the group threw the items. Plaintiffs attempt to minimize the items thrown at the officers, but concede that the crowd threw some rocks and at least one bag of feces.

The officers began herding the crowd toward a park west of Jackson, across Shepard from the District Energy plant. The officers used tear gas and smoke bombs to force the crowd to move west; Plaintiffs contend that the crowd was already moving west and that there was no need for the police to use any force to ensure that movement. Moreover, Plaintiffs allege that the tear gas and smoke bombs were aimed into the crowd, rather than at the back of the crowd. Defendants claim that they repeatedly asked the crowd to disperse. Again, Plaintiffs contend that they did not hear any dispersal requests.

Once the crowd was contained in the park, the officers made several public announcements that the entire crowd was under arrest. However, not everyone in the crowd was actually arrested, and indeed fewer than half of those in the park were booked and taken

into custody. Eight of the Plaintiffs were among those released without booking. Plaintiffs make much of the fact that Senior Commander Neuberger stated that he knew he did not have probable cause to arrest everyone in the park. (Neuberger Dep. at 94.) A full reading of Neuberger's deposition, as well as that of the second-in-command officer, Commander Frazer, however, shows that the officers intended merely to detain all individuals within the park prior to an individual determination as to which people should be arrested and booked:

> [W]e set up a crime scene, detained the people inside, and the folks in the field, who had actually experienced the behavior, witnessed the behavior then needed to go in and say, "Okay. This person is guilty of felony assault. This person would be a rioter or [had committed] unlawful assembly," and actually vet who is arrested, formally arrested and taken to jail.

(Id. at 93.)

> A. [W]e started to take people out of that encirclement who we clearly knew were not involved in the group that had attacked [the officers.] As I said earlier, the group that attacked [the officers] made it pretty easy for us. They kept constricting in size and staying together . . . . And then when we were comfortable and confident that we had only the people who were involved in the attack on [the officers], we kind of stopped for a few minutes, . . . and did an assessment.
>
> . . . .
>
> Q. Were there any—were there any individuals in the encirclement that you had doubts about whether to book or let go?
>
> A. Once we separated the groups, no. I believe that everybody that was in there should have been booked and we had probable cause to book.

(Frazer Dep. at 133, 140.)

Plaintiffs now allege excessive force, arrest without probable cause, and violations of First Amendment rights against the City of St. Paul and a number of St. Paul police officers.

4

The Complaint is styled as a class action, but Plaintiffs have never sought class certification and thus the case remains an individual action.

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**A.      Qualified Immunity**

Qualified immunity shields police officers from suit if the officer reasonably believed that his or her conduct was lawful "in light of clearly established law and the information possessed" by him or her at the time of the alleged incident. Smithson v. Aldrich, 235 F.3d

5

1058, 1061 (8th Cir. 2000) (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)). Qualified immunity is "immunity from suit rather than a mere defense to liability." Hunter v. Bryant, 502 U.S. 224, 227 (1991). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Id. at 229 (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)).

On a motion for summary judgment, the Court undertakes a three-part inquiry to determine whether a police officer is entitled to qualified immunity. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). First, the plaintiff must assert a violation of a constitutional or statutory right. Second, that right must be clearly established. Third, taking the facts in the light most favorable to Plaintiffs, "there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated that right." Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999). Although an official's entitlement to qualified immunity is a question of law, if there are genuine disputes as to the facts material to the qualified immunity determination, summary judgment is not appropriate. Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994).

**B.     Unlawful Arrest**

The parties cite cases from the Court of Appeals for the D.C. Circuit for their respective positions with respect to Plaintiffs' unlawful arrest claims.

Plaintiffs rely on Barham v. Ramsey, 434 F.3d 656 (D.C. Cir. 2006), for their contention that a mass arrest of individuals is unconstitutional unless the arresting officers had particularized information that each of the individuals violated the law. Barham arose

6

out of anti-globalization protests during International Monetary Fund meetings in Washington in 2002. On the first day of those meetings, defendant Newsham, a police commander, observed small-scale demonstrations throughout his watch area, including protesters knocking over trash cans and newspaper vending machines. He arrived at a park in the area to find it crowded with people, some of whom were chanting and dancing, but none of whom appeared to be engaged in any kind of organized protest. Id. at 569. He observed the park for 45 minutes, noting that pedestrian traffic continued to move freely through the park during that time. However, despite this, he decided to arrest everyone within the park, and to do so without giving any orders to disperse. The park was cordoned off, and ultimately 386 people were arrested and charged with failing to obey a dispersal order.

The district court denied summary judgment to Newsham, determining that he was not entitled to qualified immunity. The D.C. Circuit agreed, finding that his conduct violated the arrestees' constitutional rights by conducting a "mass arrest that was devoid of probable cause." Id. at 572. "Even assuming that Newsham had probable cause to believe that <u>some people</u> present that morning had committed arrestable offenses, he nonetheless lacked probable cause for detaining <u>everyone</u> who happened to be in the park." Id. at 573 (emphases in original). The court found that Newsham lacked the particularized probable cause required by Supreme Court precedent. Id. (citing Ybarra v. Illinois, 444 U.S. 85, 91 (1979)). The court was unpersuaded by the officer's attempt "to excavate probable cause not from the official reason for the arrest, but from the scattered acts of lawlessness that

Newsham and others had witnessed that morning." Id. Rather, because the police arrested everyone, despite the fact that none of the people arrested had actually been observed committing any crime, those arrests did not pass constitutional muster. Id. at 574.

The court contrasted the situation in the park with a more riot-like situation, in which "compelling circumstances" might exist to justify detaining an "undifferentiated crowd of protestors." Id. at 575. Such a situation was present in the case on which Defendants rely, Carr v. District of Columbia, 587 F.3d 401 (D.C. Cir. 2009). In Carr, a concert on the night of President George W. Bush's second inauguration turned into an "anti-inaugural march," during which police observed acts of violence such as setting fire to trash cans, breaking windows, and spray painting buildings and cars. Id. at 403-04. The entire group of marchers appeared to the police to be cheering on the acts of violence. Id. The police eventually herded the marchers into an alley and arrested everyone in the alley. Id. at 405. The plaintiffs, who admitted to being part of the march, contended that the police did not have a particularized reason to arrest every person present in the alley. The district court agreed, granting summary judgment to the plaintiffs. Id.

On appeal, the D.C. Circuit reversed, contrasting the case with the situation in Barham. The court noted that the officers in Barham were not confronting a developing riot-like situation, but rather a mere loose gathering of individuals in a public park. The crowd in Barham "never operated as a cohesive unit." Id. at 407 (quoting Barham, 434 F.3d at 569). The distinguishing fact was that the crowd in Barham had "exhibited no behavior that could allow a reasonable officer to believe everyone present had committed a crime." Id.

(alteration in original) (quoting Barham, 434 F.3d at 573). The court found that the particularized probable cause requirement is satisfied "if the officers have grounds to believe all arrested persons were a part of the unit observed violating the law." Id.

Assuming for the sake of this claim that the detention of individuals in the park constituted an arrest, Plaintiffs have not established a claim for unlawful arrest. The St. Paul police were aware that some individuals in the park might not have committed any crimes. But because the behavior of the group as a whole was alarming at best and dangerous at worst, the police believed that a mass detention of short duration was necessary. Moreover, the depositions quoted above establish that the police did attempt to separate innocent individuals from those they believed had engaged in illegal acts before any individuals were actually booked and taken away from the scene. The situation here is thus not akin to Barham, in which the police merely arrested everyone present, without any warning and without attempting any differentiation.

Ultimately, it requires too much of police faced with a riot-like situation to single out for limited detention only the people they are certain committed a crime. Police must be permitted to act against a group as a whole when the group is suspected of inciting violence, and when the situation demands it. Plaintiffs have failed to establish that Defendants violated their constitutional rights by detaining or arresting them, and Defendants are therefore entitled to qualified immunity as to the unlawful arrest claim.

**C.     First Amendment**

Nor is there any cognizable claim for a violation of Plaintiffs' First Amendment

9

rights. "It is undisputed that protesting peaceably is protected speech. Violent protest is not." Cross v. Mokwa, 547 F.3d 890, 898 (8th Cir. 2008) (citing NAACP v. Claiborne Hardware Co., 458 U.S. 886, 933 (1982)). Plaintiffs admit that the crowd threw some rocks and at least one bag of feces. Moreover, the police at the intersection of Jackson and Shepard put in an urgent call for back-up, showing that they feared that the protest was turning violent. Plaintiffs have failed to establish that the police were retaliating against them on the basis of their speech, and they have therefore not established any violation of their constitutional rights. Defendants are entitled to qualified immunity on this claim as well.

**D. Excessive Force**

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). In making this determination, the Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue [and] whether the suspect poses an immediate threat to the safety of the officers or others . . . ." Id. Finally, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

As the Supreme Court has recognized, courts must remember that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 397. This is precisely why the officers' conduct here withstands constitutional scrutiny. Taking the evidence in the light most favorable to Plaintiffs, it is clear that the officers were concerned that the situation was devolving into a riot, and that it was not a situation they could easily control. Even if Plaintiffs are correct that the officers fired smoke bombs into the crowd, the Court cannot say that this action was unreasonable in light of the situation facing the officers at the time. Defendants are entitled to qualified immunity on Plaintiffs' excessive force claim.

**E.     City of St. Paul**

A government entity such as the City of St. Paul may be vicariously liable for the unconstitutional actions of individual police officers only if a municipal custom or policy is the "moving force [behind] the constitutional violation." Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978). Because Plaintiffs have failed to establish that any of the individual officers violated their constitutional rights, the City has no vicarious liability and the Monell claim against the City of St. Paul fails.

Plaintiffs also attempt to bring a slightly different claim against the City, alleging that the decision to clear downtown of all civilians, or most civilians, violated their free-speech rights. This claim also fails. The City's decision was not unconstitutional. The police must be allowed to keep order. After a day of increasingly violent protests, and with the prospect of a visit by the First Lady looming, the police reasonably believed that preventing entrance to downtown was the best way to reestablish order. There is no indication that police

blocked entrance to downtown for an extended period of time. Rather, they determined that a blockade of limited duration was necessary to accomplish their legitimate public safety goals. Plaintiffs' claims against the City fail.

**CONCLUSION**

As the Court noted at the hearing, the evidence in this case shows that the St. Paul police deserve commendation for their actions during the Republican National Convention. Instead, they and the taxpayers of St. Paul are faced with this meritless, attention-seeking lawsuit. Defendants are entitled to qualified immunity on all of Plaintiffs' claims, and Plaintiffs' lawsuit must be dismissed.

Accordingly, **IT IS HEREBY ORDERED** that:

1. The Motion for Summary Judgment (Docket No. 36) is **GRANTED**; and
2. The Second Amended Complaint (Docket No. 25) is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: Thursday, October 28, 2010

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge